Jay L. Pomerantz
**FENWICK & WEST LLP**
Silicon Valley Center
801 California Street
Mountain View, CA 94041
Telephone: 650-988-8500

David W. Feder
**FENWICK & WEST LLP**
902 Broadway, Suite 14
New York, NY 10010-6035
Telephone: 212-430-2600

*Attorneys for Plaintiff*
*Lashify, Inc.*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| LASHIFY, INC., | Case No.:  3:21-cv-20785 |
| Plaintiff, | **MEMORANDUM OF LAW IN SUPPORT OF LASHIFY, INC.'S MOTION FOR A PRELIMINARY INJUNCTION** |
| v. | |
| CAPACITY LLC, CAPACITY WEST LLC, AND NOAH SANGE, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................1

STATEMENT OF FACTS ...............................................................2

    A.    Lashify's Growth and Value as a High-Luxury Brand........................2

    B.    Lashify Engages Capacity under the Agreements to Fulfill Customer Orders in Accordance with the Lashify's High Standards .....................................................................4

    C.    Capacity Materially Breaches the Agreements, Causing Lashify to Terminate the Agreements....................................5

    D.    Capacity Holds Lashify's Inventory Hostage, Imperiling Lashify's Business and Brand..............................................8

    E.    Irreparable Harm to Lashify .................................................9

ARGUMENT:   LASHIFY IS ENTITLED TO A MANDATORY PRELIMINARY INJUNCTION COMPELLING DEFENDANTS TO SURRENDER AND RETURN ALL LASHIFY INVENTORY IN THEIR POSSESSION ...........................................................11

    A.    Lashify Is Suffering, and Will Continue to Suffer, Irreparable Harm to Its Reputation and Goodwill. ............................14

    B.    Lashify has a Reasonable Probability of Eventual Success in the Litigation ...............................................................20

        1.    Lashify Has Reasonable Probability of Success on Its Breach of Contract Claims........................................21

        2.    Lashify Has a Reasonable Probability of Success on Its Fraud Claim........................................................23

    C.    Capacity Will Suffer No Harm From Returning the Inventory to Lashify, Whose Survival is Threatened if the Motion is Denied. ..............................................................25

    D.    The Public Interest Weighs in Favor of an Injunction ......................27

CONCLUSION ..........................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Acierno v. New Castle Cnty.*,
40 F.3d 645 (3d Cir. 1994) ............................................................20

*Adams v. Freedom Forge Corp.*,
204 F.3d 475 (3d Cir. 2000) .........................................................14

*Constructors Ass'n of W. Pa. v. Kreps*,
573 F.2d 811 (3d Cir. 1978) ..........................................................12

*Coyle v. Englander's*,
199 N.J. Super. 212, 488 A.2d 1083 (App. Div. 1985)....................21

*Doran v. Salem Inn, Inc.*,
442 U.S. 922 (1975)........................................................................19

*First Gen. Const. Corp. v. Westampton Cts. Condo. Ass'n*,
No. A-5932-13T1, 2016 WL 1368906
(N.J. Super. Ct. App. Div. Apr. 7, 2016)........................................22

*Gennari v. Weichert Co. Realtors*,
148 NJ. 582, 691 A.2d 350 (1997) ................................................23

*Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*,
774 F.3d 192 (3d Cir. 2014) ..........................................................14

*Jewish Cir. of Sussex Cnty. v. Whale*,
86 N.J. 619, 432 A.2d 521 (1981) ..................................................23

*Lightning Lube, Inc. v. Witco Corp.*,
4 F.3d 1153 (3d Cir. 1993) ............................................................23

*Magnet Resources, Inc. v. Summit MRI, Inc.*,
318 N.J. Super. 275, 723 A.2d 976 (App. Div.1998).......................23

*Marsellis-Warner Corp. v. Rabens*,
51 F. Supp. 2d 508 (D.N.J. 1999)...................................................27

*Melville v. Spark Energy, Inc.*,
No. 15-8706 (RBK/JS), 2016 WL 6775635 (D.N.J. Nov. 15, 2016)................21

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Minard Run Oil Co. v. U.S. Forest Serv.*,
  670 F.3d 236 (3d Cir. 2011) ................................................................. 18

*N.W. Controls v. Outboard Marine Corp.*,
  317 F. Supp. 698 (D. Del. 1970) .......................................................... 19

*Newlife Homecare Inc. v. Express Scripts, Inc.*,
  No. 3:07CV761, 2007 WL 1314861 (M.D. Pa. May 4, 2007) .................... 12, 18

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck
  Consumer Pharms. Co.*,
  290 F.3d 578 (3d Cir. 2002) ................................................................. 14

*Punnett v. Carter*,
  621 F.2d 578 (3d Cir. 1980) ................................................................. 20

*Read v. Profeta*,
  397 F. Supp. 3d 597 (D.N.J. 2019) ....................................................... 23

*Reilly v. City of Harrisburg*,
  858 F.3d 173 (3d Cir. 2017) ........................................................... 11, 20

*Twin Crest Grp. v. Del. Valley Urology, LLC*,
  No. CIV. 10-6350 JS, 2013 WL 6508242 (D.N.J. Dec. 12, 2013) .............. 23

*Universal Marine Ins. Co. Ltd. v. Beacon Ins. Co.*,
  581 F. Supp. 1131 (D.N.C. 1984) ......................................................... 27

*Ventrice v. Lexington Ins. Co.*,
  No. 2:16-CV-00660, 2018 WL 4735766 (D.N.J. Oct. 2, 2018) ................. 21

*Video Pipeline, Inc. v. Buena Vista Home Entm'nt, Inc.*,
  275 F. Supp. 2d 543 (D.N.J. 2003) ....................................................... 21

*W.S. Int'l, LLC v. M. Simon Zook Co.*,
  No. CIV.A. 11-3014, 2011 WL 1832282 (E.D. Pa. May 12, 2011),
  *aff'd sub nom., W S Int'l, LLC v. M. Simon Zook, Co.*, 566 F.
  App'x 192 (3d Cir. 2014) ................................................................ 12, 14

**STATUTES AND RULES**

Fed. R. Civ. P. 65 ............................................................................ 1, 2, 9

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

N.J.S.A. § 12A:7–209 ............................................................................26

**OTHER AUTHORITIES**

*Wright & Miller*, 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.) ...........................19

*Restatement (Second) of Contracts* § 241 (1981) ...................................................22

iv

Plaintiff Lashify, Inc. ("Lashify") submits this Memorandum of Law in support of its Motion for a Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Lashify asks the Court for emergency relief because it is at dire risk of going out of business.  Lashify is a direct-to-customer seller of eyelash extensions and related products.  It contracted earlier this year with Defendant Capacity LLC ("Capacity") for third-party logistics ("3PL") services for packaging and shipment of Lashify's products.  When Capacity proved utterly incapable of providing the services Lashify contracted for and imperiled Lashify's business, Lashify terminated the contract and filed this lawsuit.

Lashify has taken swift action to extricate itself from its failed relationship with Capacity.  But it cannot survive the damage it suffered and continues to suffer at Capacity's hands without the Court's immediate help.  Capacity is holding Lashify's inventory hostage.  It holds a critical portion of Lashify's domestic inventory, including the majority of stock of some of Lashify's top selling products, with a retail value exceeding $10 million.  Without this inventory, Lashify is completely out of some products and running out of others and cannot fulfill orders.  For Lashify, this is an existential threat.  For weeks, Lashify has urged Capacity to make its inventory available for pickup and explained the dire

consequences to Lashify if it does not.  Lashify also offered an interim solution

that would allow Lashify to retake possession of its inventory, in exchange for

valuable consideration, while allowing Capacity to reserve all rights to make any

claims or defenses against Lashify.  Capacity will not budge.  A preliminary

injunction is necessary to end Capacity's stranglehold on Lashify's business and to

stop the irreparable harm Capacity continues to inflict on Lashify's business,

reputation, and goodwill with each passing day.

## STATEMENT OF FACTS

### A.    Lashify's Growth and Value as a High-Luxury Brand

Since its establishment in 2018, Lashify and its founder and CEO, Sahara

Lotti, have cultivated a sizeable and loyal customer following for its pioneering

at-home-application eyelash extension technology.  In a crowded field of lash

extension companies, Lashify and Ms. Lotti have worked tirelessly to distinguish

Lashify as a high-end, luxury brand that customers associate with innovative

products, dedication to customer service and uncompromising quality.  *See*

Declaration of Christine Parker ("Parker Decl.") ¶ 2.

Every aspect of the Lashify customer experience is carefully and

meticulously designed with high-end luxury in mind.  *Id.*  A core part of the

curated customer experience Lashify provides customers is the packaging,

assembly and presentation of Lashify's products for delivery.  Since Lashify's

inception, its products have been shipped in a distinct all-black, Lashify-branded package with thoughtful details, such as paper wrapping, a wax seal, and protective bedding, as provided below:

 

Lashify's status as a luxury brand is critical to its business.  A large portion of Lashify's customer base orders products on a subscription basis such that customers know and expect a high level of consistency and quality from Lashify. *Id.* ¶ 11; *see also* Declaration of Natasha Golitsina ("Golitsina Decl.") ¶ 5.  In addition to Lashify's distinctive packaging and assembly of products, Lashify customers have also come to expect easy ordering, reliable shipping, high levels of

quality control, and attentive customer service.  *See* Parker Decl. ¶ 2.

**B.    Lashify Engages Capacity under the Agreements to Fulfill Customer Orders in Accordance with the Lashify's High Standards**

As a result of Lashify's and Ms. Lotti's tireless work over the past four years, Lashify has experienced exponential business growth.  To accommodate that growth, Lashify sought to partner with a 3PL service provider that could capably and reliably pack and ship Lashify's products to its expanding customer base while maintaining the high standards expected of Lashify.

For that reason, Lashify entered into a series of agreements with Capacity, a 3PL service provider, in May 2021.  Golitsina Decl. ¶ 6.  Those agreements—the Master Services Agreement ("MSA"), and related Statement of Work ("SOW"), and Amendment to Third Party Warehousing and Order Fulfillment Agreement ("Amendment," and collectively, "Agreements")—called for Capacity to provide fulfillment, packaging and delivery services for shipments to Lashify customers in certain regions within the United States, Canada, and the United Kingdom (through a third-party).  The Agreements require Capacity to use reasonable care in providing its 3PL services to Lashify and to follow Lashify's specifications for the packaging and shipment of its products.

**C.    Capacity Materially Breaches the Agreements, Causing Lashify to Terminate the Agreements**

Despite Capacity's assurances that it was up to the task of fulfilling orders in accordance with the Lashify brand, Capacity repeatedly failed to perform its services as contemplated by the Agreements.  Capacity failed in numerous and varying respects that, in the aggregate, have had a devastating effect on Lashify's business.  Capacity's serial failures of performance go to the very core of its fulfillment obligations and include, but are not limited to:

- mispackaging goods so that customers received incomplete orders;

- splitting orders between multiple shipments without ever communicating having done so to Lashify or to the end customer;

- using incorrect, substandard packaging;

- losing and failing to fulfill large quantities of orders;

- failing to fulfill overnight shipping; and

- double shipping thousands of orders, resulting in extra shipments totaling more than $500,000 in goods.

For example, the images below demonstrate the stark difference between a package prepared according to Lashify's specifications as required under the Agreements (left) and an example of a shipment fulfilled by Capacity received by one of Lashify's customers, who opened a customer complaint ticket (right).



*See* Parker Decl. ¶ 5.  Lashify's customers paid for and rightly expected shipments commensurate with the sleek, at-home-luxury experience offered by Lashify; they instead received products haphazardly tossed in a cardboard box without care or consideration.  *Id.*

These were not one-off failings or exceptions by Capacity.  These pervasive and persistent failures demonstrate that Capacity was wholly unprepared from the outset to fulfill its promises to Lashify.  In its pre-contract discussions with Lashify, Capacity touted its technological capabilities, which it claimed would allow it to sync its computer systems with Shopify, the industry standard e-commerce platform used by Lashify and numerous other retailers to handle and track online sales and shipments.  But, on information and belief, Capacity was

unable to integrate with Shopify, which caused many of the fulfillment issues described herein.  Indeed, Capacity was unable to fix these problems in any reliable manner despite receiving extensive, near-daily reports from Lashify for months on the issues encountered by Lashify's customers.  *See* Parker Decl. ¶ 6.

Capacity's failures threatened to decimate Lashify's business.  Customers lodged numerous complaints with Lashify about shipping issues, and negative public perceptions of Lashify began to appear on social media.  *See id.*  ¶ 7.  By December 2021, after months of substandard 3PL service by Capacity and false assurances by Capacity that the issues raised by Lashify would be addressed, it became clear that Capacity was unable to remediate and that any further shipments by Capacity would result in severe harm to Lashify's business and reputation. Golitsina Decl. ¶¶ 14, 20.  Capacity materially breached the agreements repeatedly over the course of the parties' relationship.  Against this backdrop, Lashify was left with no choice but to notify Capacity of its intention to terminate the Agreements and cease any further shipments from Capacity's facilities.

In short, Capacity's representations to Lashify that it was up to the task of providing fulfillment services for a luxury brand were false, and Lashify relied on those false representations when it entered into the Agreements.  Capacity's subsequent material breach of the Agreements then caused Lashify to lose

customers, goodwill and sales, and caused irreversible damage to Lashify's reputation and brand.

**D.    Capacity Holds Lashify's Inventory Hostage, Imperiling Lashify's Business and Brand**

Unable to rely on Capacity, Lashify reverted to fulfilling orders out of its own warehouse in North Hollywood, California in December 2021.  But because a considerable portion of Lashify's existing inventory remained in Capacity's possession, Lashify has already run out of stock of a number of key items, including Lashify's signature shipping boxes and best-selling flagship products, and is on the cusp of running out of others.  *See id.*  ¶¶ 18–20.

Lashify's dire situation is well-known to Capacity.  Counsel for Lashify began corresponding with Capacity on December 16, 2021 to inform it of Lashify's urgent inventory issues and to urge Capacity to tender the inventory for retrieval by Lashify.  *See* Declaration of Jay Pomerantz ("Pomerantz Decl.") ¶ 2. The responses from Capacity's counsel have failed to set out any timeframe pursuant to which Capacity would permit Lashify to pick up its inventory from Capacity's facilities.  *Id.* ¶ 7.  Instead, Capacity wrongfully maintains that it is entitled under the Agreements to a lien on Lashify's inventory pending satisfaction of damages it claims it is owed by Lashify.  Although Lashify—not Capacity—is clearly the damaged party, Lashify proposed a workaround: a resolution that would include Capacity's expedient return of Lashify's inventory while tabling the legal

8

disputes without jeopardizing Lashify's ongoing existence.  To that end, on December 27, 2021, Lashify's counsel emailed Capacity's counsel a proposed interim settlement agreement by which (i) Capacity would permit a phased retrieval of Lashify's inventory, (ii) Lashify would tender Capacity $100,000— effectively, a bond comparable to the "security" called for under Fed. R. Civ. P. 65, and (iii) the parties would reserve all claims and defenses regarding the disputes arising from or related to the Agreements.  *Id.* ¶ 10.  The parties have since traded proposals, but Capacity continues to demand an astronomically-high payment from Lashify in complete disregard of the severe harm Capacity has caused and continues to cause Lashify.  Left with no viable alternative, Lashify filed the Complaint and instant motion, just as it has told Capacity it would for more than two weeks.

### E.    Irreparable Harm to Lashify

Based on historical trends and past sales data, if Capacity does not return Lashify's inventory and Lashify is unable to take or fulfill online orders of particular products, Lashify's retail sales will drop by approximately 20% in January 2022.  Golitsina Decl. ¶ 14.  That sort of drop in Lashify's monthly retail sales will continue—and likely worsen—unless Capacity returns Lashify's inventory, because it will take time to replenish Lashify's stock.  The global supply chain crisis has delayed international shipments and increased costs.  Lashify

forecasts that rush shipping will boost expenses by 10-to-20%. *Id.* ¶ 15.  The

increase in expenses, coupled with the drop in revenue, will negatively affect

Lashify's cash flow.  As a relatively small, private company, if Lashify runs out of

cash to operate its business, Lashify will be forced into insolvency.

The inability to satisfy customer demand is particularly harmful to

businesses like Lashify that depend heavily on a subscription model.  Lashify

derives a significant percentage of sales from customers that make a one-time

purchase of a lash application kit and then subscribe to regular, ongoing orders of

eyelash extensions based on their needs.  *Id.* ¶ 13.  Subscription customers must

make a minimum monthly purchase, which is $40, and many regularly purchase

substantially more on a recurring, monthly basis.  Because Lashify operates on a

subscription model, Lashify's sales are generally consistent throughout the

year.  Lashify's inability to fulfill clients' subscription orders may cause clients to

cancel their subscriptions, reduce this important and dependable revenue stream,

and cause significant damage to Lashify's business.  *Id.*

The loss of subscription revenue also imperils Lashify's ability to attract the

outside investment it needs to fund growth.  Dependable, monthly revenue is a

very important metric for investors in private companies like Lashify.

Finally, the present inventory crisis comes at a particularly perilous time for

Lashify.  Capacity's many failures to provide adequate fulfillment services already

have cost Lashify customers.  The shipping problems have also generated negative

impressions of Lashify on critical social media platforms.  *See* Parker Decl. ¶ 7.

An inability to fulfill customer orders now and in the near future due to missing

inventory would exacerbate these problems and do further damage to the brand.

In sum, Capacity is effectively holding hostage inventory with a retail value

of nearly $10.3 million and devastating Lashify's ability to fulfill orders and

remain solvent.  Lashify's business has already been subjected to considerable

stress from its engagement with Capacity and cannot be expected to survive

without the return of the Lashify inventory in Capacity's possession.  *See* Golitsina

Decl.  ¶¶ 19-20.  For that reason, Lashify has no choice but to seek emergency

relief from this Court in the form of a mandatory preliminary injunction ordering

Capacity to return Lashify's inventory.

## ARGUMENT
## LASHIFY IS ENTITLED TO A MANDATORY PRELIMINARY INJUNCTION COMPELLING DEFENDANTS TO SURRENDER AND RETURN ALL LASHIFY INVENTORY IN THEIR POSSESSION

To obtain a preliminary injunction, a movant must show: "(1) a reasonable

probability of eventual success in the litigation, and (2) that it will be irreparably

injured . . . if relief is not granted."  *Reilly v. City of Harrisburg*, 858 F.3d 173, 176

(3d Cir. 2017) (internal quotation marks and citation omitted).  In addition, a court

should consider, "when they are relevant, (3) the possibility of harm to other

interested persons from the grant or denial of the injunction, and (4) the public interest." *Id.* (internal quotation marks and citation omitted).

The Third Circuit has repeatedly held that a "district court—in its sound discretion—should balance those four factors so long as the party seeking the injunction meets the threshold on the first two." *Id.* (collecting cases). The Court's flexibility and discretion to balance the four factors is key. *Id.* at 178-79. "How strong a claim on the merits is enough depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Id.* at 178 (citation omitted). In balancing these elements, the court should attempt to minimize the probable harm to legally protected interests between the time of the preliminary injunction to the final hearing on the merits. *Constructors Ass'n of W. Pa. v. Kreps*, 573 F.2d 811, 815 (3d Cir. 1978).

To this end, courts in the Third Circuit have not hesitated to exercise their equitable authority to enjoin conduct that would put a company out of business. *See, e.g.*, *W.S. Int'l, LLC v. M. Simon Zook Co.*, No. CIV.A. 11-3014, 2011 WL 1832282, at *6 (E.D. Pa. May 12, 2011), *aff'd sub nom., W S Int'l, LLC v. M. Simon Zook, Co.*, 566 F. App'x 192 (3d Cir. 2014) (granting temporary restraining order requiring return of plaintiff's property from defendant without which plaintiff would not survive); *Newlife Homecare Inc. v. Express Scripts, Inc.*, No.

12

3:07CV761, 2007 WL 1314861, at *9 (M.D. Pa. May 4, 2007) (granting injunction to require payment of contested moneys due to plaintiff at imminent risk of insolvency).

As set forth below, Lashify meets the standard for a preliminary injunction. Capacity unreasonably refuses to relinquish inventory that Lashify desperately needs to fulfill customer orders and stave off financial ruin. Lashify already finds its business and reputation severely compromised by Capacity's abject failure to provide the 3PL services it promised under the contract. Capacity has caused and will continue to cause, immediate and irreparable injury to Lashify, including to Lashify's business, reputation, and goodwill, for which there is no adequate remedy at law. Lashify is likely to succeed on its claims for breach of that contract, fraudulent inducement, and related causes of action. A balancing of the relevant factors clearly weighs in favor of injunctive relief, as the imminent harm to Lashify is obvious and significant, and no harm would befall Capacity if the Court were to enjoin their harmful conduct. Finally, an injunction is in the public interest since restoring the inventory to Lashify will allow it to continue operating as a business, retain and compensate its employees, and fulfill its obligations to investors and vendors.

Lashify is able to establish all of the requirements justifying issuance of a mandatory preliminary injunction ordering Capacity to return all of Lashify's

inventory in its possession within five (5) business days after the issuance of the
Court's order.  (Capacity has already represented to Lashify that, if Capacity were
so inclined, it could return Lashify's inventory within five business days.  *See*
Pomerantz Decl. ¶ 16.)

> ### A.   Lashify Is Suffering, and Will Continue to Suffer, Irreparable Harm to Its Reputation and Goodwill.

A preliminary injunction should issue when necessary to prevent irreparable
harm.  *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer
Pharms. Co.*, 290 F.3d 578, 595 (3d Cir. 2002).  To show irreparable harm, a
plaintiff must demonstrate "a significant risk that he or she will experience harm
that cannot adequately be compensated after the fact by monetary damages."
*Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (3d Cir. 2000).  Because
Lashify is unable to fulfill orders "without injunctive relief," Lashify's business is
in "serious jeopardy;" the Third Circuit "recognize[s] this sort of harm as
irreparable."  *W S Int'l, LLC*, 566 F. App'x at 197.  It is also well-settled that
"harm to reputation and goodwill constitutes irreparable harm."  *Groupe SEB USA,
Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 205 (3d Cir. 2014).

As detailed above, Capacity possesses and refuses to tender a substantial
percentage of Lashify's inventory of top-selling products and its signature
packaging.  This threatens to devastate Lashify, which has run out of or is soon to
run out of these items and will be unable to fulfill customer orders.  This is

particularly problematic for Lashify, whose business is heavily predicated on subscribers who make regular, ongoing orders of eyelash products.  An inability to fulfill subscription orders will drive these clients elsewhere, causing significant damage to Lashify's business.

The sworn declaration of Lashify's Head of Finance Natasha Golitsina details the imminent financial ruin Lashify faces.  Golitsina Decl. ¶¶ 14-15.  Without a swift return of its inventory, Golitsina and Lashify forecast a 20% drop in retail sales in January 2022 alone, with a cascading effect on sales in future months due to cancelled subscriptions.  *Id.*  If subscribers cannot get the products they need from Lashify, they will buy these products elsewhere and cannot be expected to resume their Lashify orders in future months and years.  This is particularly true given how many competitors and Lashify imitators there are in the lash extension market.

At the same time, Lashify cannot obtain more product in time to satisfy demand.  Ordering new merchandise takes at least a month in normal times.  But well-documented issues with the global supply chain mean that it will take considerably longer for Lashify to replenish its dwindling and depleted inventory.  Lashify forecasts additional expenses of up to 20% to replace the inventory trapped at Capacity.  *Id.* ¶ 15.  And even after paying that premium, Lashify still cannot expect the arrival of new supply shipments for months.  A simultaneous decrease

in sales and increase in sourcing costs will have an extremely negative effect on

Lashify's cash flow, which will drive Lashify into insolvency.

The diminution of the normally dependable, recurring revenue that Lashify

derives from subscribers will have other negative consequences.  Subscription

revenue is a very important metric for private companies like Lashify, which must

attract outside investment to grow their business.  The loss of subscribers not only

negatively impacts current and near-term revenues, but would damage the business

for years to come, destroying its value proposition for investors.  In addition,

Lashify incurred substantial expenses over time to build its all-important

subscriber base.  Thus, the loss of subscriber customers not only deprives Lashify

of counted-on recurring revenues, but also means that Lashify will lose what it

invested to attract the subscribers in the first instance.

All of this comes as Lashify attempts to rescue its brand and reputation from

the devastating impact of the shipping problems already caused by Capacity.

Indeed, the Court need not speculate about the threat Capacity's intransigence

poses to Lashify's continued existence.  The Complaint and accompanying

declarations clearly attest to the extensive damage Capacity's woeful performance

has already caused.  Lashify's devoted customers struggled to square Capacity's

slipshod packaging, incomplete shipments, and fulfillment delays with the first-

class service they had come to expect from Lashify.  Parker Decl. ¶¶ 5, 6.  Lashify

thrives on word-of-mouth social media messaging and worked hard to cultivate that loyal following.  But that good will can last only so long if Lashify's customers cannot get the products they have come to depend on.  The ripple effect that negative social media posts will have on Lashify's reputation will drive customers to competitors and hasten Lashify's decline.

The charts and figures in the Golitsina Declaration attest to the growing inventory crisis at Lashify.  Golitsina Decl. ¶¶ 18-19.  Capacity possesses Lashify products with a retail value of approximately $10.3 million, including the following items that Lashify needs to fulfill customer orders but are depleted or soon will be depleted at Lashify's North Hollywood distribution center:

| Item Description | Inventory Quantities | |
|---|---|---|
| | Lashify | Capacity |
| Lashify Small Luxe Mailer Boxes (LMB01) | 0 | 66678 |
| Lashify Medium Luxe Mailer Boxes (LMB02) | 1513 | 26400 |
| LED Infinity Mirror (LEDM02) | -48 | 578 |
| Magic Cleansing Puff (BCP01) | 25 | 3000 |
| Charcoal Cotton Swabs 50 Pack (CS001) | 27 | 3257 |
| Glass (GS03) | -160 | 5378 |
| Core Amplify Gossamer® Lashes 18mm (GA18) | -139 | 1,750 |
| Core Curl Gossamer® Lashes 8mm (GC08) | 167 | 1,244 |
| Core Curl Gossamer® Lashes 12mm (GC12) | -2,111 | 27,391 |
| Volume Extreme Gossamer® Lashes 14mm (GE14) | -449 | 7,506 |
| Volume Starburst™ Gossamer® Lashes 14mm (GSB14) | -139 | 13,117 |

*Id.*  But that is only the beginning.  The chart below demonstrates that Lashify will run out of at least twelve (12) best-selling items in January 2022 absent Court intervention:

| Item Description | Inventory Quantities | |
|---|---|---|
| | Lashify | Capacity |
| Core Amplify Gossamer® Lashes 8mm (GA08) | -615 | 3,317 |
| Core Amplify Gossamer® Lashes 10mm (GA10) | -3,568 | 5,923 |
| Core Amplify Gossamer® Lashes 12mm (GA12) | -380 | 9,442 |
| Core Amplify Gossamer® Lashes 18mm (GA18) | -425 | 1,750 |
| Core Bold Gossamer® Lashes 10mm (GB10) | -2,034 | 14,348 |
| Core Curl Gossamer® Lashes 8mm (GC08) | -2,012 | 1,244 |
| Core Curl Gossamer® Lashes 12mm (GC12) | -18,275 | 27,391 |
| Volume Drama Gossamer® Lashes 10mm (GD10) | -385 | 929 |
| Volume Extreme Gossamer® Lashes 14mm (GE14) | -2,036 | 7,506 |
| Volume Starburst™ Gossamer® Lashes 14mm (GSB14) | -4,088 | 13,117 |
| Volume Starburst™ Gossamer® Lashes 16mm (GSB16) | -2,544 | 11,337 |
| Volume Starburst™ Gossamer® Lashes 18mm (GSB18) | -376 | 6,283 |

*Id.*

In short, Lashify cannot fulfill orders and save its business without the inventory that Capacity is holding hostage.  Courts in this Circuit recognize the need for interim relief in these circumstances.  *See, e.g.*, *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 255 (3d Cir. 2011) (finding emergency injunctive relief warranted "where the potential economic loss is so great as to threaten the existence of the movant's business"); *Newlife Homecare*, 2007 WL 1314861, at *6 (granting injunctive relief where company established that it would "be forced out

of business and/or into bankruptcy due to the defendant's failure to release the payments"); *N.W. Controls v. Outboard Marine Corp.*, 317 F. Supp. 698, 703 (D. Del. 1970) ("Where the economic loss involved would be so great as to threaten destruction of the moving party's business, a preliminary injunction should be issued to maintain the status quo."). *See also Wright & Miller*, 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.) ("when the potential economic loss is so great as to threaten the existence of the moving party's business, then a preliminary injunction may be granted, even though the amount of direct financial harm is readily ascertainable").

Time is of the essence, and if Capacity is not forced to immediately cease its unlawful activity and tender the inventory, Lashify will be unable to fulfill its obligations to its customers, will suffer incalculable losses with respect to lost profits, lost opportunities to serve new customers, lost credibility, damage to reputation, and organizational instability. Lashify is in imminent danger of suffering "a substantial loss of business and perhaps even bankruptcy," which, as the Supreme Court has recognized, "sufficiently meets the standard for granting interim relief, for otherwise a favorable final judgment might well be useless." *Doran v. Salem Inn, Inc.*, 442 U.S. 922, 932 (1975).

### B.     Lashify has a Reasonable Probability of Eventual Success in the Litigation

To obtain injunctive relief, Lashify must first show "a reasonable probability of eventual success in the litigation." *Reilly*, 858 F.3d at 176.  This "requires a showing significantly better than negligible but not necessarily more likely than not." *Id.* at 179 & n.3 ("a likelihood of success on the merits does not mean more likely than not") (internal quotation marks and alterations omitted).  To satisfy this element, "[i]t is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather the burden is on the party seeking relief to make a prima facie case showing a reasonable probability that it will prevail on the merits." *Punnett v. Carter*, 621 F.2d 578, 583 (3d Cir. 1980); *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994) (noting that the movant must generally show a *reasonable* probability of success in the litigation).  As set forth below, Lashify is likely to succeed on the merits on each of its claims.

Defendants' flagrant course of conduct and intentional misstatements throughout the parties' business relationship have crippled Lashify's business.  *See* Golitsina Decl. ¶ 14-15.  As detailed in the Complaint, Lashify has substantial evidence that Defendants repeatedly breached and repudiated their obligations under the Agreements and knowingly made false misrepresentations and/or omissions in connection with their ability to adequately perform.  Although Lashify is likely to succeed on the merits on all of its claims, including breach of

contract, breach of the implied covenant of good faith and fair dealing, fraud, fraud

in inducement, and conversion, for the sake of simplicity, this Motion focuses

solely on its claims for breach of contract and common law fraud against

Defendants.

### 1.    Lashify Has Reasonable Probability of Success on Its Breach of Contract Claims

To prevail on a breach of contract claim under New Jersey law, a plaintiff

must prove four elements: (1) a valid contract existed between plaintiff and

defendant; (2) defendant breached this contract; (3) plaintiff performed under this

contract; and (4) plaintiff was damaged as a result of defendant's breach. *Video

Pipeline, Inc. v. Buena Vista Home Entm'nt, Inc.*, 275 F. Supp. 2d 543, 566 (D.N.J.

2003) (*citing Coyle v. Englander's*, 199 N.J. Super. 212, 223, 488 A.2d 1083 (App.

Div. 1985)); *see Melville v. Spark Energy, Inc.*, No. 15-8706 (RBK/JS), 2016 WL

6775635, at *5 (D.N.J. Nov. 15, 2016) (stating elements and denying motion to

dismiss claim for breach of contract).

The Agreements represent valid contracts between Lashify, on the one hand,

and Capacity, on the other.  Defendants cannot make a single, non-frivolous

argument that they did not materially breach the Agreements based on their

conduct.  *See, e.g., Ventrice v. Lexington Ins. Co.*, No. 2:16-CV-00660, 2018 WL

4735766, at *5 (D.N.J. Oct. 2, 2018) ("A material breach of a contract relieves an

aggrieved party of its obligations under the contract.").  In determining the

materiality of a breach, New Jersey courts consider "the ratio quantitatively which the breach bears to the contract as a whole, and secondly the degree of probability or improbability that such a breach will be repeated." *First Gen. Const. Corp. v. Westampton Cts. Condo. Ass'n*, No. A-5932-13T1, 2016 WL 1368906, at *2–3 (N.J. Super. Ct. App. Div. Apr. 7, 2016).[1]

Both considerations militate strongly in Lashify's favor.  Capacity's breaches frustrate the very purpose of the contract.  Capacity was hired as a third-party logistics provider to fulfill shipment orders for Lashify's customers with "reasonable care."  Compl., Ex. A, ¶ 5.  Capacity abjectly failed to do so.  For months, it repeatedly shipped some orders twice, some not at all, some with missing products, and some in generic, shoddy packaging, all in violation of the

---

[1] New Jersey courts also consider the elements set forth in the *Restatement (Second) of Contracts* § 241 (1981):

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Westhampton*, 2016 WL 1368906, at *2-3.

contract.  Indeed, "[w]here a contract calls for a series of acts over a long term, a material breach may arise upon a single occurrence or consistent recurrences which tend to defeat the purpose of the contract." *Twin Crest Grp. v. Del. Valley Urology, LLC*, No. CIV. 10-6350 JS, 2013 WL 6508242, at *8 (D.N.J. Dec. 12, 2013) (citing *Magnet Resources, Inc. v. Summit MRI, Inc.,* 318 N.J. Super. 275, 723 A.2d 976, 981 (App. Div.1998)).  Lashify has demonstrated that it is likely to succeed on the merits of its breach of contract claim.

> ### 2.     Lashify Has a Reasonable Probability of Success on Its Fraud Claim

Lashify can likewise satisfy the elements of common law fraud under New Jersey law because it can show proof Defendants made (1) a material representation of a present or past fact (2) with knowledge of its falsity (3) with the intention that the other party rely thereon (4) which resulted in reasonable reliance by plaintiff and (5) which resulted in damages.  *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1182 (3d Cir. 1993) (*citing Jewish Cir. of Sussex Cnty. v. Whale*, 86 N.J. 619, 624, 432 A.2d 521 (1981) (applying New Jersey law)); *Read v. Profeta*, 397 F. Supp. 3d 597, 635 (D.N.J. 2019) (*citing Gennari v. Weichert Co. Realtors*, 148 NJ. 582, 610, 691 A.2d 350 (1997) (listing elements)).

As detailed in the Complaint, Defendants' fraudulent conduct in this case plainly satisfies these factors.  Lashify has substantial evidence that Defendants made intentional false statements concerning their ability to integrate with

Lashify's business and provide for seamless fulfillment of customer orders to fraudulently induce Lashify into entering into the Agreements. Once the Agreements were effectuated and it became glaringly apparent to all parties that Defendants were unable to satisfy their obligations under the contract, Defendants made numerous false statements and misrepresentations to perpetuate their fraud by reassuring Lashify that the ongoing fulfillment issues—double shipments, a failure to present Lashify's product appropriately, incorrectly picked orders, severe shipping delays, and inaccurate inventory management—would not recur. Defendants knew that they were making material misstatements and misrepresentations of material facts and/or omissions of material facts to induce Lashify to enter into and remain party to the contract, and Defendants deliberately made those statements and omissions deliberately and with an intent to deceive. *See generally* Golitsina Decl. ¶¶ 8-11. Defendants then intentionally concealed the losses they incurred at Lashify's expense, to continue billing Lashify for their shoddy work and to hide their inability to satisfy the requirements of the contract. Defendants' intentional false statements at the outset of and then throughout the course of the parties' relationship constitute breach and repudiation of their fundamental contractual obligations under the Agreements.

The Complaint (Compl. ¶¶ 78-91) alleges, and the facts presented herein demonstrate, that (i) the falsity of such information was unknown to Lashify, (ii)

Defendants knew and intended that Lashify would rely to its detriment upon Defendants' misrepresentations and omissions, (iii) Lashify reasonably relied to its detriment upon Defendants' misrepresentation and omissions, and (iv) Lashify was damaged.  Lashify has clearly made a *prima facie* case of common law fraud; and the facts presented amply demonstrate that Lashify has a reasonable probability of success on its claim for common law fraud.

### C.   Capacity Will Suffer No Harm From Returning the Inventory to Lashify, Whose Survival is Threatened if the Motion is Denied.

The balance of harms clearly favors granting injunctive relief.  With its breach, Capacity has no right to the inventory, cannot liquidate it for anything near its retail value and, per Lashify's proposal, would not relinquish any legal or equitable claims or defenses against Lashify on account of releasing the merchandise to Lashify.  Lashify, on the other hand, needs the inventory to fulfill orders and maintain its business.  Capacity will live to fight another day; Lashify may not.

Compliance with the Court order sought by Lashify would impose no burden on Capacity, which, after all, is in the business of preparing inventory for transfer. Capacity has communicated to Lashify through counsel that it can ready all of Lashify's inventory for pickup in just five days.  Pomerantz Decl. ¶ 16.  Lashify also understands and believes that some of the most critical inventory is readily available for pickup from the Capacity West location.  Capacity West only recently received substantial inventory from Lashify in November and December 2021.

That inventory was never shipped to customers because Lashify declined to go live with Capacity West due to the various ongoing fulfillment issues Capacity faced as described above.  On information and belief, much, if not all, of the inventory in the Capacity West warehouse remains on pallets and is available for immediate delivery to Lashify.  Indeed, Lashify was told on Friday, December 17, 2021 by a manager at the Capacity West warehouse that Capacity West would ready the inventory for pickup on the next business day, Monday, December 20.

Defendants have claimed that they are entitled to retain Lashify's inventory under N.J.S.A. § 12A:7–209, commonly known as a warehouseman's lien.  But the statute is clear that a warehouseman's lien is "limited to charges in an amount or at a rate specified in the warehouse receipt."  N.J.S.A. § 12A:7–209.  Defendants' argument that they are justified in continuing to retain Lashify's inventory is incongruous because the amount of Lashify's inventory in Capacity's possession has a retail value of $10.3 million, which is over four times the amount Capacity alleges (wrongly) is owed to them under the Agreements.  In light of Capacity's numerous breaches and failures to perform under the Contract, Lashify does not concede that it owes any amount to Capacity.  Nevertheless, in an effort to resolve the pending dispute concerning return of Lashify's inventory, Lashify offered to provide Capacity, pending final resolution of any disputed claims, the sum of $100,000, which in substance would serve as a cash bond, in exchange for

Capacity's relinquishment of Lashify's inventory. *See* Pomerantz Decl. ¶ 10.
Capacity rejected this offer and demanded instead an astronomically-high payment
from Lashify in complete disregard of the severe harm Capacity has caused and
continues to cause Lashify. *Id*. ¶¶ 10-16.

In short, in an effort to address the urgent concern of the return of Lashify's
inventory, Lashify offered to provide a cash bond to Capacity pending resolution
of the other claims before this Court. Capacity cannot claim that they would be
somehow harmed if the Court were to return Lashify's inventory because Lashify
has already offered to provide a cash bond to address Capacity's concerns
regarding payment of fees.

### D.    The Public Interest Weighs in Favor of an Injunction

"Where a party demonstrates both the likelihood of success on the merits
and irreparable injury, 'it almost always will be the case that the public interest will
favor' the issuance of an injunction." *Marsellis-Warner Corp. v. Rabens*, 51 F.
Supp. 2d 508, 532-33 (D.N.J. 1999). Here, granting the injunction will advance
the public's interest in the prevention of fraud and barring Capacity from holding
hostage Lashify's inventory. *See Universal Marine Ins. Co. Ltd. v. Beacon Ins.
Co.*, 581 F. Supp. 1131, 1140 (D.N.C. 1984) ("The public interest against
encouraging or tolerating fraud can be protected only if an injunction is issued").
The public interest will be served by the compelled return of Lashify's inventory

from Capacity's warehouses, which will enable Lashify to continue its business, employ and pay its workers and abide by its vendor and other contractual obligations.

## CONCLUSION

For the reasons set forth above, Lashify respectfully requests that this Court grant the instant motion and issue a mandatory preliminary injunction ordering Capacity to return Lashify's inventory immediately.

Dated: December 31, 2021                    Respectfully submitted,

By:   */s/ David W. Feder*
            David W. Feder
            **FENWICK & WEST LLP**
            902 Broadway, Suite 14
            New York, NY 10010-6035
            Telephone: 212-430-2600

            Jay L. Pomerantz *
            **FENWICK & WEST LLP**
            801 California Street
            Mountain View, CA 94041
            Telephone: 650-988-8500

            * *pro hac vice* forthcoming

            *Attorneys for Plaintiff*
            *Lashify, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of December 2021, a copy of the

foregoing **MEMORANDUM OF LAW IN SUPPORT OF LASHIFY, INC.'S MOTION FOR**

**A PRELIMINARY INJUNCTION** was filed with the Clerk of the Court, District of

New Jersey, and will be sent via email to counsel for Defendants as follows:

Joshua Bratspies
jbraatspies@shermanatlas.com

By:   _/s/ David W. Feder_
David W. Feder